**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**January 28, 2015**

# In the Court of Appeals of Georgia

A14A2019. HARPER v. THE STATE.

BARNES, Presiding Judge.

A jury convicted Joel Ledarius Harper of two counts of armed robbery and one count of aggravated assault. Following the denial of his motion for new trial, Harper filed this appeal, arguing that the evidence was insufficient, the trial court erred in allowing the State to present similar transaction evidence, and that his trial counsel was ineffective. For the reasons that follow, we affirm Harper's convictions.

> When evaluating the sufficiency of evidence, the proper standard for review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence.

*Hayes v. State*, 292 Ga. 506 (739 SE2d 313) (2013).

So viewed, the evidence showed that a South Carolina man (the buyer) called his friend in Atlanta and asked him to set up a deal for the buyer to purchase several pounds of marijuana for $1,000 per pound. The friend contacted a middleman, who eventually brokered a deal with a seller he knew as "Money Mike." The buyer drove to his friend's house and counted out the money needed to complete the deal, then the friend drove the buyer to meet the middleman at a fast-food restaurant in the general location Money Mike had identified as the site of the deal. The middleman then called Money Mike, who gave him the address of a residence nearby, and the friend and the buyer followed the middleman in a separate car to that location.

The friend stayed in the car while the buyer and the middleman entered the house and closed the front door. The middleman walked in first, with the buyer following behind him. The middleman testified, "[T]he next thing I know, the gun is pointed in my face." The gunman, who the middleman identified in a photographic lineup later that day as Harper, pulled out a second gun and ordered the middleman and the buyer to the ground, threatening to shoot the men and demanding money. The buyer and middleman threw the contents of their pockets on the ground, including the middleman's wallet, ID, and cell phone. Harper insisted that there should be more money and said, "Go get the rest of the money." The middleman testified that he

2

thought Harper meant that only one of them should go, but both men saw an opportunity to get away so they both bolted for the door. The middleman reached the door first and heard a shot behind him, but kept running until he reached a store where he called 911.

The friend testified that he was waiting in his car when suddenly the buyer burst out of the door and ran off, followed by a gunman with an automatic weapon who fired two shots at the buyer. The friend ducked down, slid over to the driver's side of the car, and drove off to look for the buyer, but could not locate him and eventually ended up calling 911 from the same store the middleman did. The friend accused the middleman of setting up the assault and robbery, and feared the buyer was dead, but a responding officer said they had located the buyer, who had lost a lot of blood from a gunshot wound in his thigh but would be okay.

The responding officers initially arrested both the middleman and the friend and interviewed them after they were advised of their *Miranda* rights. They had found the middleman's ID and cell phone on the floor in the house, and the middleman gave them permission to search his phone and obtain the number he had been calling to set up the drug deal. The middleman's cell phone showed that he had called a particular

3

phone number six times between 1:36 p.m. and 2:29 p.m. on the day of the assault and robbery.

A detective entered the number culled from the middleman's phone into a database of police reports and found a 2008 accident report which identified the number as belonging to a woman who turned out to be Harper's sister. The detective then entered the sister's address into the same database and discovered several police reports that identified the address as belonging to Joel Harper. The detective then obtained a photograph of Harper and placed it into a photographic lineup. He showed the lineup to the middleman, who identified Harper as the man who robbed and shot at him and the buyer. The detective obtained an arrest warrant for Harper, who had two cell phones on him when he was arrested nine days after the robbery and aggravated assaults. One of the cell phones rang when the detective called the number the middleman had identified as the one he had called to set up the drug deal.

1. Harper argues that the evidence against him was insufficient to sustain the convictions because at trial the middleman recanted his identification of Harper in the photographic lineup as the shooter and no other witness identified him. The State did not ask the middleman to identify Harper at trial, but instead simply confirmed that he had identified Harper's photograph from the lineup on the day of the crime as the

4

man who robbed and shot at him. While admitting that he had not been forced to identify anyone in the lineup, the middleman testified on direct that he had been very nervous at the time, and during cross-examination he testified that he could not say that Harper was the man who had pulled a gun on him, because Harper did not "have the features." Further, the buyer who was shot did not testify, the State explaining outside the presence of the jury that the buyer had "refused to get on the bus and come from South Carolina." Finally, the friend who had waited in the car while the buyer and middleman went into the house testified that he told police he did not get a good look at the gunman, and no one asked him at trial to identify Harper as the gunman.

Despite the middleman's recantation of his identification of Harper at trial, his initial identification of Harper in the photographic lineup, along with the evidence tying Harper to the cell phone used to set up the drug deal, were sufficient. See *Gibson v. State*, 272 Ga. 801, 804 (4) (537 SE2d 72) (2000) ("[T]estimony from a police officer who conducted a lineup identification as to the identity of persons picked out of such a lineup is admissible."); *In the Interest of M.D.L.*, 271 Ga. App. 738, 740 (1) (b) (610 SE2d 687) (2005) (witness's prior identification of defendant as perpetrator of crime constitutes substantive evidence despite recantation at trial).

5

"The evidence of record, construed favorably to the jury's verdict, was sufficient to enable a rational trier of fact to conclude that appellant was guilty of [two counts of] armed robbery" and aggravated assault. *Guyton v. State*, 272 Ga. 529, 530 (1) (531 SE2d 94) (2000).

2. Harper asserts that the trial court erred in allowing the State to submit similar transaction evidence of his prior guilty plea to two counts of robbery because the State failed to prove a sufficient similarity between the prior crime and the current one to show bent of mind or identification.

> [B]efore [similar transaction evidence] is admissible, the trial court must determine that the State has affirmatively shown that: (1) the State seeks to admit evidence of the independent offenses or acts for an appropriate purpose; (2) there is sufficient evidence that the accused committed the independent offenses or acts; and (3) there is sufficient connection or similarity between the independent offenses or acts and the crimes charged so that proof of the former tends to prove the latter.

(Citation and punctuation omitted.) *Reed v. State*, 291 Ga. 10, 12 (3) (727 SE2d 112) (2012). We accept the trial court's factual findings unless they are clearly erroneous, and review the trial court's evidentiary rulings for abuse of discretion. Id. at 14 (3).

During the pre-trial hearing on the State's motion to admit similar transaction evidence, the State proffered that Harper's co-defendant in the similar transaction

6

would testify that Harper had called the co-defendant to ask if he had a gun because he wanted to commit a robbery. The State further proffered that the co-defendant did have a gun, that Harper picked him up in Harper's father's car, and that the two of them robbed two house painters of $700 cash, wallets, a cell phone, and keys. The victims obtained the license number of the robbers' car, which the police traced to Harper's father, which led to the identification of Harper and the co-defendant. The State offered the evidence to show Harper's bent of mind[1] and mode of operation, and at the proffer the State said it did not intend to introduce the similar transaction to show identity because the middleman in the current case had identified Harper in the photographic lineup. The trial court ruled preliminarily that if the co-defendant in the similar transaction testified at trial that the prior robbery was Harper's idea and that Harper had asked the co-defendant if he still had his gun, then the prior act was "similar enough for the State to attempt to introduce it to show bent of mind and possibly identification if that becomes an issue in the case."

---

[1]Effective January 1, 2013, Georgia's revised evidence code no longer allowed the State to introduce similar transactions to show a defendant's bent of mind or course of conduct. OCGA § 24-4-404 (b); *Johnson v. State*, 292 Ga. 22, 25 (2), n. 3 (733 SE2d 736) (2012). This case was tried in 2012.

During the course of the trial, as previously noted, the middleman recanted his identification of Harper as the gunman. After he testified, the trial court asked the State inform the court before calling the similar transaction witness so it could give the limiting charge beforehand, and asked, "[Y]our purpose was method of operation and, I guess, identity?" The State responded, "Identity, mode of operation, yes." At that point, the trial court's ruling that the similar transaction evidence was *possibly* admissible to prove identification changed to a ruling that the evidence was *certainly* admissible to provide identification. Harper did not object.

Seven more witnesses testified, and before the State called Harper's co-defendant in the previous crime, Larry Dixon, to testify, the trial court and parties held a discussion off the record. The trial court then gave a limiting charge to the jury that the law provided that evidence of other alleged acts by the defendant that were sufficiently similar or connected and related to the offenses for which the defendant was on trial could be considered "for the limited purpose of showing, if it does, the identity of the perpetrator or the method of operation in the crimes charged in the case that's now on trial." The court then reminded the jury that Harper was on trial only for the indicted offenses, and that before it could consider the other alleged acts, it should first determine whether Harper committed those acts, and if so, whether the

8

prior act was sufficiently similar and related to the crimes charged such that proof of the former tended to prove the latter. Harper made no objection.

When called to the stand, however, Dixon only admitted knowing Harper and denied remembering any details of the crime itself or the incriminating statement he had given to police, explaining that he never read the statement and was "drunk and high" when he signed it out of fear he would spend the rest of his life in prison.

Outside of the jury's presence, the State asked permission to call the detective in charge of the similar transaction case to impeach Dixon regarding his prior inconsistent statement. After conferring about the case law, the trial court ruled that the State could call the detective to testify about Dixon's prior inconsistent statement. The detective then testified that Dixon told him he had a gun, that Harper had driven his father's car to the crime scene, and that the two of them had robbed two men of their cell phones, wallets, and money. The State also introduced a certified copy of Harper's conviction for two counts of robbery.

(a) While Harper argues on appeal that the trial court erred in finding that the prior crimes were sufficiently similar to be admissible, "[t]he independent crime and the charged offense need not be identical in character if there is a sufficient connection between them." *Williams v. State*, 295 Ga. App. 249, 251 (1) (671 SE2d

9

268) (2008). The proper focus is the similarities between the crimes, not the differences. *Phillips v. State*, 287 Ga. 560, 564 (4) (697 SE2d 818) (2010). In this case, both the prior crimes and the current one involved an armed robbery with a handgun, in which Harper demanded that multiple victims give him their money, and in both instances the victims' cash, wallets, and cell phones were taken. We find no abuse of discretion in the trial court's decision to allow the similar transaction evidence.

(b) Harper also argues that the crimes were not sufficiently similar to prove identity.

> A much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind. Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated murders, robberies, or rapes. The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.

(Citations and punctuation omitted.) *Cole v. State*, 216 Ga. App. 68, 70 (1) (453 SE2d 495) (1994).

Prior to our Supreme Court's ruling in *Whitehead v. State*, 287 Ga. 242, 245-249 (2) (695 SE2d 255) (2010), a defendant was required to renew his objection to

10

a similar transaction ruling at trial to preserve it for appellate review, even if he had previously objected during the required pre-trial hearing on admissibility. In *Whitehead*, the Supreme Court noted that, while standard practice had long required a party to make and obtain a ruling on an objection to evidence before or as the evidence was admitted to preserve the objection for appeal, only as to similar transactions was a party required to renew before a jury "an objection that was made and ruled on at a preliminary hearing held to determine the admissibility of that very evidence." Id. at 247 (2). Seeing a trap for the unwary, the court abandoned the "unique repetitive objection rule for similar transaction evidence" and held that a defendant was no longer required "to raise and have overruled before the jury the very same objection to similar transaction evidence that already was raised and ruled on by the trial court." Id. at 248-249 (2).

In this case, however, the trial court did not issue a final ruling on the admissibility of the similar transaction evidence to prove identity at the pretrial hearing, stating only that the evidence might "possibly" be admissible to prove identity. At that point, the State did not anticipate that it would need to introduce the similar transaction evidence to prove identity, given that the middleman had previously identified Harper in a photo line-up as the gunman. It was only after the

11

middleman recanted his identification that the State then sought, upon the trial court's prompting, to use the similar transaction evidence to prove identity, and Harper did not object. Thus the analysis in *Whitehead*, 287 Ga. at 248-249 (2), that to preserve the issue for appellate review, the defendant need not renew an objection to the admission of evidence that the trial court had previously ruled admissible, does not apply in this case, because the trial court did not issue a final ruling on the identity issue at the pretrial hearing, and the basis for the State's tender of the similar transaction evidence changed mid-trial when the middleman recanted his identification of Harper as the gunman. At that point, when the trial court issued its final ruling on the matter, Harper was required to object to the use of the evidence to prove identity, and he did not do so, thus waiving his right to argue the issue on appeal.

(c) Harper also contends, correctly, that the trial court erred in admitting evidence that Harper had entered a guilty plea to two counts of robbery in the similar transaction because Harper had been granted First Offender status and thus had not been "convicted." See *Davis v. State*, 269 Ga. 276, 278-279 (2) (496 SE2d 699) (1998). And while the trial court subsequently revoked Harper's First Offender status and resentenced him on the robbery charges, it did so after his trial on the current

charges ended. But "a prior bad act need not result in a criminal conviction in order to be used as a similar transaction," because the critical element is the similarity of the facts rather than the adjudication of any charges brought as a result of the prior act. Id. at 278 (2). See *Tilly v. State*, 197 Ga. App. 97, 99 (2) (397 SE2d 506) (1990) (first offender disposition and discharge of the earlier accusation did not preclude admitting evidence of underlying conduct as a similar transaction). Thus, while it was error to admit the evidence that appellant had entered a guilty plea to the earlier charge as a First Offender, that admission is not reversible error in light of the other evidence incriminating Harper in the prior crimes. See Davis, 269 Ga. at 279 (2).

3. Harper contends his trial counsel was ineffective in several respects. To prevail on a claim of ineffective assistance of counsel, Harper must show both that trial counsel's performance was deficient and that the deficient performance was prejudicial to his defense. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Aaron v. State*, 275 Ga. App. 269, 271 (4) (620 SE2d 499) (2005).

(a) Harper first contends his counsel was ineffective for failing to call an alibi witness at trial, who testified at the motion for new trial hearing that Harper had been working at a car wash and had washed her car on the day of the robbery and assault,

around the same time. However, trial counsel testified that he and Harper discussed the fact that Harper needed an alibi witness and that counsel had attempted to contact every name and telephone number Harper or his girlfriend had given him. A trial counsel is not ineffective for failing to call an alibi witness the defendant never identified. *Palmer v. State*, 274 Ga. 796, 797 (5) (560 SE2d 11) (2002). Harper has not established that his trial counsel knew or should have known about the witness who testified at the hearing, and therefore has not established that his trial counsel's performance was deficient in this regard.

(b) Harper next contends his trial counsel was ineffective for failing to call an eyewitness neighbor to testify. The neighbor testified at the motion for new trial hearing that he was in his house when he heard shots, and when he looked outside he saw a tall, dark-skinned man run out of the house with a duffel bag, get into a car, and leave. He was certain that the man he saw run out of the house was not Harper, because Harper was too short and his complexion was too light. Trial counsel testified that he had spoken with the witness, who became angry and unresponsive after counsel subpoenaed him to testify. When the witness did not come to court, trial counsel made a strategic decision after the State rested not to force the witness to court based on his lack of cooperation and because he thought the State's case was

14

weak. The trial court did not abuse its discretion in determining that this strategic decision did not constitute ineffective assistance of counsel. *Sharif v. State*, 272 Ga. App. 660, 663 (5) (613 SE2d 176) (2005) ("Tactical or strategic decisions such as the failure to call certain witnesses do not equate with ineffective assistance of counsel.")

(c) Finally, Harper claims his trial counsel was ineffective for failing to file a motion to suppress the middleman's pre-trial identification of Harper in the photographic line-up and for failing to impeach the middleman with evidence of his prior felony conviction. First, Harper has identified no grounds that would have supported a motion to suppress, such as an impermissibly suggestive lineup. See, e.g., *McCowan v. State*, 325 Ga. App. 509, 511 (753 SE2d 775) (2014) (addressing grounds for suppressing pre-trial identification).

Second, trial counsel explained that he chose not to impeach the middleman because his trial testimony that Harper was not the perpetrator was "very beneficial" to the defense. The middleman was the State's key witness, and trial counsel wanted the jury to believe the middleman's trial testimony that Harper did not do it rather than his pre-trial identification of Harper as the gunman.

> Informed strategic decisions do not amount to inadequacy. The fact that appellant and his present counsel now disagree with the difficult

15

decisions regarding trial tactics and strategy made by trial counsel does not require a finding that appellant received representation amounting to ineffective assistance of counsel.

(Citation and punctuation omitted.) *McKenzie v. State*, 284 Ga. 342, 348 (4) (c) (667 SE2d 43) (2008).

Trial counsel's decision to focus on the middleman's recantation of his pre-trial identification of Harper was clearly strategic and the trial court did not err in finding that counsel's performance was not deficient.

*Judgment affirmed. Boggs and Branch, JJ., concur.*